## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PLUMBERS & PIPEFITTERS LOCAL 178 HEALTH & WELFARE TRUST FUND, on behalf of itself and all others similarly situated,<br><br>     Plaintiff,<br><br> v.<br><br>TEVA PHARACEUTICALS USA INC.; TEVA PHARMACEUTICAL INDUSTRIES LTD.; TARO PHARMACEUTICALS USA, INC.; TARO PHARMACEUTICAL INDUSTRIES LTD.; SUN PHARMACEUTICAL INDUSTRIES LTD.; FOUGERA PHARMACEUTICALS, INC.; SANDOZ, INC.; NOVARTIS INTERNATIONAL AG; ACTAVIS HOLDCO U.S., INC.,<br><br>     Defendants. | Case No. 1:16-cv-9659<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Plumbers & Pipefitters Local 178 Health & Welfare Trust Fund ("Local 178" or "Plaintiff"), by and through the undersigned counsel, allege the following based upon information and belief (except for those allegations relating to Plaintiff):

## INTRODUCTION

1. Plaintiff brings this action on behalf of itself and on behalf of all persons and entities in the United States and its territories who purchased, paid, and/or provided reimbursement for some or all of the purchase price of generic fluocinonide—defined hereafter as generic fluocinonide topical cream (strength: 0.05%); generic fluocinonide topical gel (strength: 0.05%); and generic fluocinonide topical ointment (strength: 0.05%)—manufactured by Defendants during the period August 1, 2014 to the present.

1

2.      Fluocinonide is an "upper mid-strength" corticosteroid used topically as an anti-inflammatory agent for the treatment of skin disorders such as eczema and seborrhoeic dermatitis. It relieves itching, redness, dryness, crusting, scaling, inflammation, and discomfort.

3.      The Food & Drug Administration (FDA) first approved fluocinonide for sale and marketing in the U.S. in 1971, under the brand name Lidex and in the form of topical cream (strength: 0.05%). In the decades that followed, the FDA also approved fluocinonide for sale and marketing in the U.S. in the forms of topical gel (strength: 0.05%) and topical ointment (strength: 0.05%), among others.

4.      Beginning in 1987 and thereafter, the FDA approved generic fluocinonide for sale and marketing in the U.S. in the same forms: topical cream (strength: 0.05%); topical gel (strength: 0.05%); and topical ointment (strength: 0.05%), among others.

5.      Plaintiff alleges that Defendants Teva, Taro, Fougera, and Actavis (as defined below)—the principal manufacturers of generic fluocinonide—have conspired, combined, and contracted to fix, raise, maintain, and stabilize the prices at which generic fluocinonide would be sold.

6.      The claims in this case arise from a broad conspiracy among manufacturers of generic drugs to fix the prices charged for those drugs—including other topical corticosteroids—in recent years. This conspiracy was effectuated by direct company-to-company contacts among generic drug manufacturers, as well as joint activities undertaken through trade associations such as the Generic Pharmaceutical Association ("GPhA"). The unlawful acts undertaken with respect to generic fluocinonide arise from that larger conspiracy.

7.      Beginning in the summer of 2014, each Defendant raised the price of generic fluocinonide dramatically to more than double the previous purchase price, on average—without

any proffered explanation for the unprecedented and sudden increase. For example, as of July 23, 2014, the average cost of a 15-gram tube of generic fluocinonide cream was $11.10 ($0.74 per gram), and less than one month later the average cost for the same tube was $24.78 ($1.65 per gram). Similarly, as of July 23, 2014, the average cost of a 30-gram tube of generic fluocinonide cream was $15.64 ($0.52 per gram) as opposed to $48.41 ($1.61 per gram) just one month later.

8.     These and other recent precipitous price hikes by drug manufacturers for generic drugs have prompted extensive scrutiny by the press, the United States Congress, and federal and state antitrust regulators. In 2014, the Antitrust Division of the United States Department of Justice ("DOJ") commenced a wide-ranging criminal investigation of this broad conspiracy and caused grand jury subpoenas to be issued to various generic drug manufacturers in connection with this investigation.[1]

9.     All of the Defendants—Teva, Taro, Fougera, and Actavis—have been subpoenaed by the DOJ as part of its ongoing investigation of anticompetitive practices in the generic pharmaceutical industry.

10.     These subpoenas followed reports that highlighted concerns about the rising prices of generic drugs generally, and generic dermatological creams and ointments more specifically. A 2016 study published in *JAMA Dermatology* concluded that "[t]he price of prescription dermatologic drugs [including generic fluocinonide] rose considerably from 2009 to 2015, with the vast majority of price increases occurring after 2011. Percent increases for multiple, frequently prescribed medications greatly outpaced inflation, national health

---

[1] The investigation encompasses a number of generic drugs and, as the scope of the DOJ's investigation is further clarified, Plaintiff reserves the right to amend its complaint to add more parties and/or claims.

expenditure growth, and increases in reimbursements for physician services."[2] Dr. Steven Rosenberg, a study co-author and a dermatologist who teaches at the University of Miami Miller School of Medicine noted that "[t]he prices have skyrocketed with no justification."[3] The study authors "also pointed out that none of the medicines surveyed appear on the list of drug shortages maintained by the Food and Drug Administration." *Id.*

11.     In August 2016, fluocinonide was listed in a General Accounting Office ("GAO") report as a generic drug that had experienced "extraordinary price increases" in 2014.[4]

12.     These extraordinary price increases were not the result of supply shortages, demand spikes, or other market conditions. Rather, they were the result of Defendants' coordinated and collusive efforts and agreement, which violate the Sherman Act (15 U.S.C. § 1, *et seq.*), as well as state antitrust, consumer protection, and common laws.

13.     As a result of Defendants' unlawful conduct, Plaintiff and the other members of the proposed Classes paid artificially inflated prices during the Class Period that exceeded the amount they would have paid if a competitive market had determined the prices for generic fluocinonide.

## JURISDICTION AND VENUE

14.     Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26), for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

---

[2] http://jamanetwork.com/journals/jamadermatology/article-abstract/2471623.

[3] https://www.statnews.com/pharmalot/2015/11/25/dermatology-drug-prices/.

[4] *See* http://www.gao.gov/assets/680/679022.pdf.

15.     This action also includes claims under the antitrust, consumer protection, and common laws of various states for damages and equitable relief, as described in Counts Two through Four below.

16.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is also conferred upon this Court by 28 U.S.C. § 1367. Finally, jurisdiction is conferred upon this Court by the Class Action Fairness Act of 2005 ("CAFA"), which amended 28 U.S.C. § 1332 to add a new subsection (d) authorizing federal jurisdiction where "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." The $5 million amount-in-controversy and diverse-citizenship requirements of CAFA are satisfied here.

17.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.[5]

18.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold generic fluocinonide throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

---

[5] As used herein, the term "Class Period" means August 1, 2014 to the present.

## PLAINTIFF

19.     Plaintiff Plumbers & Pipefitters Local 178 Health & Welfare Trust Fund ("Local 178" or "Plaintiff"), located in Springfield, Missouri, is a local union that provides health care and other benefits to its members who reside in Missouri as well as other locations throughout the United States, through its not-for-profit trust fund. Local 178 indirectly purchased generic fluocinonide during the Class Period as defined below, and was injured in its business or property by reason of the violations of law alleged herein. For prescriptions of generic drugs, such as generic fluocinonide manufactured by one or more Defendants, the employee plan participant typically pays a portion of the cost of the prescription. Participating pharmacies collect the co-payment from the employee plan participant and bill Local 178 for the remaining cost of the generic fluocinonide purchases.

## DEFENDANTS

20.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva USA is a wholly owned subsidiary of Defendant Teva Pharmaceutical Industries Ltd. During the Class Period, Teva USA marketed and sold generic fluocinonide to customers in this District and other locations in the United States.

21.     Defendant Teva Pharmaceutical Industries Ltd. ("Teva Israel") has its principal place of business in Petah Tikva, Israel. During the Class Period, Teva Israel, through its subsidiary Teva USA, marketed and sold generic fluocinonide to customers in this District and other locations in the United States.

22.     In this complaint, Teva USA and Teva Israel will be referred to collectively as "Teva."

6

23. Defendant Taro Pharmaceuticals USA, Inc. ("Taro USA") is a New York corporation with its principal place of business in Hawthorne, New York. Taro USA is a wholly-owned subsidiary of Defendant Taro Pharmaceutical Industries, Ltd. During the Class Period, Taro USA marketed and sold generic fluocinonide to customers in this District and other locations in the United States.

24. Defendant Taro Pharmaceutical Industries Ltd. ("Taro Israel") has its principal place of business in Haifa, Israel. Voting power in Taro Israel is 79.3% controlled by Defendant Sun Pharmaceutical Industries Ltd. ("Sun") (an Indian company that also owns other generic drug manufacturers, including Sun Pharmaceutical Industries, Inc. ("SPII"), a United States-based subsidiary with its principal place of business in Cranbury, New Jersey) or Dilip Shanghvi (the founder of Sun and Chairman of Taro) and members of his immediate family. During the Class Period, Taro Israel, through its subsidiary Taro USA, marketed and sold generic fluocinonide to customers in this District and other locations in the United States.

25. In this complaint, Taro USA, Taro Israel, and Sun will be referred to collectively as "Taro."

26. Defendant Fougera Pharmaceuticals, Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Fougera is a specialty dermatology generics company that markets and sells generic fluocinonide throughout the United States. Fougera is a wholly owned subsidiary of Sandoz, Inc. During the Class Period, Fougera marketed and sold generic fluocinonide to customers in this District and other locations in the United States.

27. Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation with its principal place of business in Princeton, New Jersey. Sandoz is a division of the Novartis Group and a

global leader in generic pharmaceuticals and biosimilars. Sandoz acquired Fougera in July 2012 for $1.5 billion in cash, making Sandoz one of the largest generic dermatology medicine companies globally and in the U.S. During the Class Period, Sandoz, through its subsidiary Fougera, marketed and sold generic fluocinonide to customers in this District and other locations in the United States.

28.     Defendant Novartis International AG ("Novartis"), is a Swiss multinational pharmaceutical company based in Basel, Switzerland. In tandem, Sandoz International GmbH and Sandoz operate as the generic pharmaceuticals division of Novartis. Novartis manufactures its dermatology products at locations in Hicksville and Melville, New York. During the Class Period, and through its subsidiaries and divisions Fougera and Sandoz, Novartis marketed and sold generic fluocinonide to customers in this District and other locations in the United States.

29.     In this complaint, Fougera, Sandoz, and Novartis will be referred to collectively as "Fougera."

30.     Defendant Actavis Holdco U.S., Inc. ("Actavis") is a Delaware corporation that has its administrative headquarters in Parsippany-Troy Hills, New Jersey. In 2012, Watson Pharmaceuticals acquired then-Switzerland-based Actavis Group to form Actavis plc, later known as Allergan plc after Actavis plc acquired Allergan Inc. in 2015. In August 2016, Teva Pharmaceutical Industries Ltd. acquired Allergan plc's generic pharmaceutical business for $40.5 billion. Actavis Holdco U.S., Inc. was among the Allergan plc generic pharmaceutical entities acquired by Teva in 2016. During the Class Period, Actavis marketed and sold generic fluocinonide to customers in this District and other locations in the United States.

31.     Whenever in this complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction

by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

32.     All acts alleged in this complaint to have been done by Defendants were performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of Defendants' business affairs.

## CO-CONSPIRATORS

33.     Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

34.     At all relevant times, each Defendant was an agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE TRADE AND COMMERCE

35.     The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

36.     During the Class Period, Defendants sold substantial quantities of generic fluocinonide in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

## FACTUAL ALLEGATIONS

### The Industry

37.      Defendants manufacture, market, and sell, among other products, generic versions of branded drugs, including generic fluocinonide, for which FDA approval can be sought only after the patent on the corresponding branded drug expires. Here, generic fluocinonide first entered the marketplace in 1987 after the first patent on the corresponding branded drug—Lidex, dating back to 1971—expired.

38.      According to the FDA's Glossary, a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[6] Once the FDA approves a generic drug as "'therapeutically equivalent'" to a brand name drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product." *Id*.

39.      A drug company seeking approval to market and sell a generic equivalent of a brand name drug must refer to the Reference Listed Drug ("RLD") in its Abbreviated New Drug Application ("ANDA"). *Id*. Once the FDA determines that a drug company's application contains sufficient scientific evidence establishing the bioequivalence of the product to the RLD, an applicant may manufacture, market, and sell the generic drug product, which provides a safe, effective, low-cost alternative to the American public. *Id*.

40.      Furthermore, the FDA will generally assign a Therapeutic Equivalence Code ("TE Code") of AB to those products it determines to be bioequivalent. [7] This coding system

---

[6] FDA Glossary, available at
http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

[7] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/
ElectronicSubmissions/DataStandardsManualmonographs/ucm071713.htm.

allows users to quickly determine important information about the drug product in question.[8] For example, the Food & Drug Administration ("FDA") states that "[p]roducts generally will be coded AB if a study is submitted demonstrating bioequivalence. Even though drug products of distributors and/or repackagers are not included in the List, they are considered therapeutically equivalent to the application holder's drug product if the application holder's drug product is rated AB."[9]

41.     The entire purpose of authorizing a generic drug industry in the United States was to encourage the manufacture of less expensive, non-branded substitutes for branded prescription drugs that either had no patent exclusivity or for which the patent exclusivity was expiring. Once the patent on a brand-name drug expires, generic manufacturers can move in, creating more competition and lower prices. In a January 2012 report, the GAO noted that "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[10]

42.     Due to the price differentials between branded and generic drugs, as well as other institutional features of the pharmaceutical industry, pharmacists liberally and typically substitute the generic drug when presented with a prescription for the branded drug. Since passage of the Hatch-Waxman Act (Pub. L. No. 98-417, 98 Stat. 1585 (codified at 15 U.S.C. §§ 355, 360cc; 35 U.S.C. §§ 156, 271)), every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

---

[8] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm#TEC.

[9] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/DataStandardsManualmonographs/ucm071713.htm.

[10] http://www.gao.gov/assets/590/588064.pdf.

43.     According to a report by the Generic Pharmaceutical Association ("GPhA"), nearly 3.8 billion (88%) of the total 4.3 billion prescriptions dispensed in the U.S. in 2014 were filled using generic drugs.[11]

44.     There has been substantial consolidation in the generic drug industry recently. The result of the generic drug industry's consolidation has been an environment ripe for collusion and higher prices for consumers. Generic manufacturers merged as a partial reaction to the consolidation of the distributors, the logic being that generic manufacturers could exert leverage to charge higher prices if distributors were stripped of the option of negotiating lower prices with other generic manufacturers offering therapeutically equivalent drugs. Market consolidation has also resulted in more generic product lines being combined or discontinued, further reducing price competition.

### Market for Generic Fluocinonide

45.     Fluocinonide is one of the most widely used dermatological drugs. It is a Class 3 "upper mid-strength" topical corticosteroid used to treat a wide variety of skin conditions, including contact dermatitis, atopic dermatitis, psoriasis, alopecia areata, sarcoidosis, and lichen planus. Fluocinonide relieves itching, redness, dryness, crusting, scaling, inflammation, and discomfort.

46.     Generic fluocinonide is the equivalent of Lidex, which County Line Pharmaceuticals, LLC (acquired by Alvogen Group, Inc. in April 2016) currently manufactures and did manufacture during the Class Period. Medicis Pharmaceutical Corporation (acquired by Valeant Pharmaceuticals International, Inc in December 2012) preceded County Line Pharmaceuticals, LLC as the original manufacturer of Lidex.

---

[11] http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

47.     The following Defendants manufactured and sold, *inter alia*, the following forms of generic fluocinonide during the Class Period, with the topical cream being the most commonly prescribed version:

| Manufacturer | Topical Cream | Topical Gel | Topical Ointment |
|---|---|---|---|
| Teva | X | X | X |
| Taro | X | X | X |
| Fougera | X | X | X |
| Actavis | X | | |

48.     Defendants collectively sell millions of dollars-worth of generic fluocinonide every year in the United States.

49.     The market for generic fluocinonide is controlled by Defendants, and it was controlled by Defendants during the Class Period.

**Defendants' Pricing Conduct for Generic Fluocinonide**

50.     Generic fluocinonide pricing was remarkably stable until mid-2014.

51.     On February 19, 20, and 21 of 2014, Defendants Taro, Teva, Sandoz, and Actavis attended the 2014 Annual Meeting Business Exposition of the Generic Pharmaceutical Association ("GPhA") CMC Workshop in Orlando, Florida. The GPhA describes itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and

services to the generic industry."[12] Less than four months later, on June 3 and June 4, 2014, Defendants Taro, Teva, Sandoz, Fougera, and Actavis attended the GPhA CMC Workshop in North Bethesda, Maryland. These meetings provided Defendants with opportunities to collude.

52.    Shortly after the CMC Workshop, pricing for generic fluocinonide manufactured and sold by the Defendants suddenly increased, on average, by over 100%.

53.    The National Average Drug Acquisition Cost ("NADAC") is a pricing reference file published by the Centers for Medicare and Medicaid Services that is based on average actual acquisition costs of various outpatient drugs collected from a monthly survey of retail community pharmacies across the United States.[13]

54.    The NADAC data for generic fluocinonide reveals a pattern of staggering price increases on or around August 2014, after which prices remained elevated well above their previous competitive levels to the present day.

55.    For example, the chart below, based on NADAC data, reveals a dramatic increase in the average per-unit price for 15g fluocinonide cream manufactured and sold by Defendants Taro, Teva, and Fougera on or around August 2014 followed by continued price elevation through 2015:

---

[12] http://www.gphaonline.org/about/the-gpha-association.

[13] *See* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

14



56.    Although Actavis did not enter the generic fluocinonide market until late 2014, it too joined the conspiracy and implemented price increases reflected in the NADAC data for 15g fluocinonide cream shown above.

57.    The NADAC data for generic 30g fluocinonide cream manufactured by Defendants Taro, Teva, Fougera, and Actavis reveals a similar pattern:



58.    The NADAC data for generic 60g fluocinonide cream manufactured by Defendants Taro, Teva, Fougera, and Actavis also reveals a similar pattern:



59.    The NADAC data for other generic fluocinonide forms—or "vehicles" (referring to the mode of delivery)—likewise evince staggering price increases in or around August 2014 followed by sustained price elevation.

60.    For example, the following chart, based on NADAC data, reveals a dramatic increase in the average per-unit price for 15g fluocinonide gel manufactured and sold by Defendants Taro and Fougera on or around August 2014 followed by continued price elevation through 2015:



61.   The NADAC data for generic 60g fluocinonide gel manufactured by Defendants Taro, Teva, and Fougera reveals a similar pattern:



62.     The same is true for generic fluocinonide ointment. The chart below, based on NADAC data, reveals a dramatic increase in the average per-unit prices for 15g fluocinonide ointment manufactured and sold by Defendants Taro, Teva, and Fougera on or around August 2014 followed by continued price elevation through 2015:



63.     The NADAC data for generic 30g fluocinonide ointment manufactured by Defendants Taro, Teva, and Fougera reveals a similar pattern:



64.    The NADAC data for generic 60g fluocinonide ointment manufactured by Defendants Taro, Teva, and Fougera also reveals a similar pattern:



65.     In most cases, the initial 2014 NADAC price increases were over 100%. Although there was some ebbing in NADAC prices following the initial increases in mid-2014, NADAC prices never declined to the levels that existed prior to the mid-2014 increases. As of December 2016, the NADAC price of generic fluocinonide remains approximately 100% higher than early 2014 levels.

66.     These substantial across-the-board price increases reflected in the NADAC data were not the result of one maverick manufacturer's decision to raise prices exponentially—which would not have been sustainable in a competitive environment as other generic fluocinonide manufacturers gained market share by selling the same product at a lower price. Rather, the

sustained price elevation reflected in the NADAC data, across generic fluocinonide in various sizes and forms, was and is the result of a conspiracy among Defendants to artificially raise, fix, maintain, and/or stabilize the price of generic fluocinonide sold in the United States.

### The Effects of Defendants' Pricing Conduct

67.     Defendants' sudden and massive price increases present a sharp departure from the previous years of low and stable prices. This in itself is indicative of collusion.

68.     There were no reasonable justifications for this abrupt shift in pricing conduct. Federal law requires drug manufacturers to report potential drug shortages to the FDA, the reasons therefor, and the expected duration of the shortage. No supply disruption was reported by the Defendants with respect to fluocinonide.

69.     And because generic pharmaceutical manufacturers do not need to incur the large research and development costs that brand manufacturers absorb in developing new drugs, the price increases cannot be attributed to the need to fund research and development.

70.     Industry analysts have suggested that recent price increases for generic fluocinonide are the result of collusion among manufacturers. Indeed, Richard Evans at Sector & Sovereign Research recently wrote: "[a] plausible explanation [for price increases of generic drugs] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation."[14]

71.     This abrupt shift in the pricing of generic fluocinonide has had a catastrophic effect on consumers. As noted in letters sent to generic drug manufacturers as part of a Congressional investigation into unexplained price increases:

---

[14] http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to operate" and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability to purchase their needed medications. The NCPA survey found that "pharmacists reported patients declining their medication due to increased co-pays," and "84% of pharmacists said that the acquisition price/lagging reimbursement trend is having a 'very significant' impact on their ability to remain in business to continue serving patients." (Footnotes omitted).[15]

72.     Norman Levine, a dermatologist in Tucson, Arizona, noted his alarm at unexplained fluocinonide price increases in a 2015 article for *Dermatology Times*:

[T]his . . . medication was now being sold for about $50.00 for a 60-gram tube, when 6 months prior [it] was one of the $4.00 specials at several chain drugstores.[16]

73.     In November 2014, the *Philadelphia Inquirer* reported the plight of Philadelphia resident Casimir Janczewski, who saw the out-of-pocket price of his generic fluocinonide cream "rise from about $26 in April to about $112 in October, even with insurance from Aetna."[17] One month later, the price had risen to $159. *Id.*

74.     A meeting of the minds among the competing sellers of generic fluocinonide assured them increased profits.

75.     These price increases are reflected in Defendants' financial results.

---

[15] The letters sent to generic drug manufacturers may be found at http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[16] http://dermatologytimes.modernmedicine.com/dermatology-times/news/tale-220-tube-clobetasol-cream-2.

[17] http://www.readingeagle.com/ap/article/justice-department-senate-investigating-generic-drug-price-hikes&template=mobileart.

76.    For example, Taro's gross profits increased over $100 million between its fiscal year ending in March 2015 and its fiscal year ending in March 2016. In an earnings call just a few months after it implemented a drastic price increase on generic fluocinonide in August 2014, Taro reported that it was "realizing the benefits of the previous quarter's price adjustments in the current quarter."[18]

**Congressional and Regulators' Responses to Rising Generic Drug Prices**

77.    As noted above, drug manufacturers' dramatic and unexplained price hikes have engendered extensive scrutiny by the United States Congress and by federal and state antitrust regulators.

78.    In a January 8, 2014 letter to members of key committees of the United States House of Representatives and Senate, Douglas P. Hoey, Chief Executive Officer of the National Community Pharmacists' Association, asked Congress to conduct an investigation of generic drug price increases.[19]

79.    On October 2, 2014, Representative Elijah E. Cummings ("Cummings"), Ranking Member of the House Committee on Oversight and Government Reform, and Senator Bernie Sanders ("Sanders"), Chairman of the Subcommittee on Primary Health and Aging of the Senate Committee on Health, Education, Labor and Pensions, sent letters to Defendants Actavis, Teva, Sun, and 11 other drug manufacturers ("October Letters") asking for detailed information on the generic price hikes.[20]

---

[18] http://www.nasdaq.com/aspx/call-transcript.aspx?StoryId=2665835&Title=taro-pharmaceutical-industries-taro-ceo-kal-sundaram-on-q2-2014-results-earnings-call-transcript.

[19] *See* https://www.ncpanet.org/pdf/leg/jan14/letter-generic-spikes.pdf.

[20] The October Letters may be found at http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

80.    On November 20, 2014, Sanders's committee held a hearing titled "Why Are Some Generic Drugs Skyrocketing In Price?" ("Senate Hearing"). Various witnesses discussed the price hikes for generic drugs.

81.    Sanders and Cummings followed up on the Senate Hearing by writing a letter on February 24, 2015 to the Office of the Inspector General ("OIG") of the Department of Health & Human Services, asking it to investigate the effect that price increases of generic drugs have had on generic drug spending within the Medicare and Medicaid programs.[21] The OIG responded in a letter dated April 13, 2015, noting it planned to engage in a review of quarterly average manufacturer prices for the top 200 generic drugs from 2005 through 2014.[22]

82.    In the meantime, the Antitrust Division of the United States Department of Justice ("DOJ") commenced a wide-ranging criminal investigation of generic drug pricing and has caused grand jury subpoenas to be issued to various generic drug manufacturers in connection with this investigation. According to a June 26, 2015 report by the service Policy and Regulatory Report ("PaRR Report") (available at http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf):

> A PaRR source says prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever. Like in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."

83.    On November 3, 2016, *Bloomberg* reported:

> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.

---

[21] http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[22] http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

. . . .

Charges could extend to high-level executives, according to the people. The antitrust division, which has an immunity program to motivate wrongdoers to confess and inform on others, has stepped up its commitment to holding individuals responsible.

84.     Most recently, on November 7, 2016, the publication *Mlex* reported that the DOJ had received assistance from a leniency applicant beginning in the summer of 2016:

While the Justice department didn't have a whistleblower at the beginning of the investigation, it is understood that this summer a company applied for leniency, which grants full immunity to the first company to come forward and admit to cartel violations. The company is understood to be privately held and hasn't publicly disclosed its involvement in the investigation.

85.     The DOJ is poised to issue criminal indictments against various companies and began doing so today. *Bloomberg* reports that "[t]he Justice Department accused two executives of colluding with other generic pharmaceutical companies to fix prices, the first criminal charges stemming from a sweeping two-year investigation. Jeffrey Glazer, a former chief executive officer of Heritage Pharmaceuticals Inc., and Jason Malek, an ex-president, were charged in Philadelphia on Wednesday, according to court filings."[23]

86.     State attorneys' general, led by the Connecticut Attorney General, have also pursued their own investigations.

87.     On June 21, 2015, Teva USA received a subpoena from the DOJ seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products.[24] On July 12, 2016,

---

[23] https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[24] *See* http://ir.tevapharm.com/phoenix.zhtml?c=73925&p=irol-sec.

Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations. *Id.*

88.    On August 6, 2015, Allergan plc (which previously owned Actavis's generic operations prior to the Teva acquisition) filed a SEC Form 10-Q, in which it disclosed that "[o]n June 25, 2015, [Actavis] received a subpoena from DOJ's Antitrust Division seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[25]

89.    According to a November 2016 *Bloomberg* report, "Novartis's Sandoz unit [including Fougera] got a U.S. Justice Department subpoena in March [2016] requesting documents related to marketing and pricing of copycat medicines."[26]

90.    On May 28, 2016, Taro's parent company, Sun, stated in a filing with the National Stock Exchange of India that "one of the Company's U.S. subsidiaries, [SPII] has received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents from SPII and its affiliates relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters. SPII is currently responding to the subpoena."[27] As noted above, Sun holds a controlling stake in Taro. "[S]oon after taking Taro in hand Sun had ferreted out a way to squeeze out more profit: steady price increases on Taro's portfolio of medicines. Since taking control those price hikes have

---

[25] https://www.sec.gov/Archives/edgar/data/1578845/000156459015006357/agn-10q_20150630.htm.

[26] https://www.bloomberg.com/news/articles/2016-11-13/novartis-said-to-hold-talks-to-buy-u-s-generics-maker-amneal.

[27] http://www.bseindia.com/corporates/ann.aspx?scrip=524715&dur=A&expandable=0, at May 28, 2016.

amounted to a 300 percent increase across Taro's portfolio, according to data provider IMS Health. The move lit a fire under Taro's profit margin, which reached nearly 60 percent last year, according to Bloomberg data."[28]

91.     Sun is one of a group of global generic drug manufacturers based in Mumbai, India that sells "super-inflated generics," according to one source.[29]

92.     On September 9, 2016, Taro Israel disclosed in an SEC filing that the DOJ issued subpoenas to Taro USA and two of its senior officers relating to its ongoing investigation of anticompetitive practices in the generic pharmaceutical industry.[30]

93.     The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's *Antitrust Division Manual*.[31] Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury

---

[28] https://www.bloomberg.com/news/articles/2016-10-12/m-a-artist-behind-india-s-best-stock-now-faces-his-greatest-test.

[29] http://epaperbeta.timesofindia.com/Article.aspx?eid=31815&articlexml=Taro-Drug-Pricing-Probe-may-Widen-to-more-14092016014050.

[30] *See* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

[31] http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

investigation." *Id*. at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id*. Thus, the fact that the Defendants and certain of their employees received federal grand jury subpoenas is a strong indication that antitrust offenses have occurred.

94.     Commentators have also taken note of the criminal subpoenas. As reported on one legal website:

> The Justice Department's subpoenas focus on sharing and exchanging of pricing information and other issues among generic drug companies. The initial subpoenas, including two senior executives, suggest that the Justice Department has specific information relating to their participation in potentially criminal conduct. It is rare for the Justice Department to open a criminal investigation with specific subpoenas for individuals, along with company-focused subpoenas.

> Given the breadth of such a potential cartel investigation, the Justice Department's inquiry of the generic pharmaceutical industry could be significant. The prices for a large number of generic drug prices have increased significantly over the last year. There does not appear to be any rational explanation for such increases involving a diverse set of products.

> The scope of these price increases and the timing of them certainly raise serious concerns about collusive activity among competitors. [32]

95.     As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "[a] DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation." [33]

---

[32] http://www.jdsupra.com/legalnews/criminal-global-cartel-focus-on-generic-92387/.

[33] https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

96.     Likewise significant is *Mlex*'s confirmation that a leniency applicant has sought amnesty from the DOJ. As the DOJ notes on its web site (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program):

**5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**

Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

What is more, the leniency applicant must also satisfy the following condition, among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials." *Id.*

**Factors Increasing the Fluocinonide Market's Susceptibility to Collusion**

97.     Publicly available data on the generic fluocinonide market in the United States demonstrates that it is susceptible to price-fixing by the Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the goods of cartel participants; (6) absence of a competitive fringe of sellers; and (7) intercompetitor contacts and communication.

98.     ***Industry Concentration***. A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.

99.     In the United States generic fluocinonide market, the Defendants named here account for nearly all sales of the drug in question. What is more, the number of competitors has

31

historically been limited to no more than four principal manufacturers, each with varying market share.

100.    The market for generic fluocinonide is mature, and the Defendants can only gain market share by competing on price.

101.    The Defendants—and no other firms—currently control the market.

102.    ***Barriers to Entry***. Supracompetitive pricing (at odds with pricing that can be sustained in a competitive environment) in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

103.    Here, there are significant capital, regulatory, and intellectual property barriers to entry in the market for generic fluocinonide.

104.    Manufacturing costs, coupled with regulatory oversight, represent a substantial barrier to entry into the generic fluocinonide market. Intellectual property costs can also be sizable.

105.    Entry into the fluocinonide market has occurred on a limited basis, as reflected, *inter alia*, by the 2014 entry of Actavis. But that entry did not curb the price-fixing in the industry.

106.    ***Demand Inelasticity***. Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. It is a measure of how demand for a product reacts to a change in price. The basic necessities of life—food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life. In other words, a

person on the verge of dying of thirst will pay almost anything for drinking water. In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made. Otherwise, increased prices would result in declining revenues and profits.

107.    Fluocinonide offers powerful relief to those suffering from a range of skin disorders that are painful and uncomfortable. Because the need for fluocinonide is great among those who are so suffering, patients have little choice but to purchase fluocinonide at the price at which it is offered. Thus, fluocinonide is an excellent candidate for price-fixing because price increases will result in more revenue, rather than less.

108.    *Lack of Substitutes*. Although there are other types of drugs to treat skin conditions, they are of different potencies and safety levels—appropriate only to specific thicknesses of skin—making them unsuitable alternatives to fluocinonide.

109.    *Standardized Product with High Degree of Interchangeability*. A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the good in question and it is easier to monitor these prices effectively. Here, the generic fluocinonide made by the Defendant manufacturers each contain identical active ingredients.

110.    *Absence of a Competitive Fringe of Sellers*. Companies that are not part of the conspiracy can erode at conspirators' market shares by offering products at a lower, more competitive price. This reduces revenue and makes sustaining a conspiracy more difficult. In the

market for generic fluocinonide, there is no realistic threat that a fringe of competitive sellers will take market share from Defendants. The Defendants have oligopolistic power in the market for generic fluocinonide, which facilitates their ability to raise prices without losing market share to non-conspirators.

111.    ***Intercompetitor Contacts and Communications***. In order to be successful, collusive agreements require a level of trust among the conspirators. Collaboration fostered through industry associations facilitate relationships between individuals who would otherwise be predisposed to compete vigorously with each other. Here, the Defendants are long-time members of or participants in the GPhA, which meets frequently and describes itself on its website as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."[34] Thus, representatives of the Defendants have opportunities to meet and conspire at functions of this group, as well as at industry healthcare meetings, including GPhA meetings immediately prior to the announcement of the generic fluocinonide price increases.

112.    The grand jury subpoenas discussed above lend further support to the conclusion that intercompetitor communications occurred among the Defendants with respect to the pricing of generic fluocinonide. Indeed, according to the previously-identified PaRR Report, "prosecutors are taking a close look at trade associations as part of their investigation as having

---

[34] http://www.gphaonline.org/about/the-gpha-association.

been one potential avenue for facilitating the collusion between salespeople at different generic producers."[35]

## DEFENDANTS' ANTITRUST VIOLATIONS

113.    During the Class Period, the Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize the prices of generic fluocinonide in the United States.

114.    In formulating and effectuating the contract, combination or conspiracy, the Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the price of generic fluocinonide sold in the United States. These activities included the following:

        a.      Defendants participated in meetings and/or conversations to discuss the price of generic fluocinonide in the United States;

        b.      Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic fluocinonide sold in the United States;

        c.      Defendants agreed during those meetings and conversations to fix the price of generic fluocinonide; and

        d.      Defendants issued price announcements and price quotations in accordance with their agreements.

Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

---

[35] http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

115.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiff and members of the Class purchased generic fluocinonide from Defendants (or their subsidiaries or controlled affiliates) or their co-conspirators at inflated and supracompetitive prices.

116.    Defendants' contract, combination, or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various states.

117.    As a result of Defendants' unlawful conduct, Plaintiff and the other members of the class have been injured in their business and property in that they have paid more for generic fluocinonide than they would have paid in a competitive market.

118.    The unlawful contract, combination or conspiracy has had the following effects, among others:

        a.    price competition in the market for generic fluocinonide has been artificially restrained;

        b.    prices for generic fluocinonide sold by the Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

        c.    purchasers of generic fluocinonide from the Defendants have been deprived of the benefit of free and open competition in the market for generic fluocinonide.

## CLASS ACTION ALLEGATIONS

119.  Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who purchased, paid, and/or provided reimbursement for some or all of the purchase price for Defendants' generic fluocinonide from August 1, 2014 through the present. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic fluocinonide for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic fluocinonide were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

120.  Plaintiff also brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states listed below (the "Indirect Purchaser States")[36] on behalf of the following class (the "Damages Class"):

> All persons and entities in the Indirect Purchaser States who purchased, paid, and/or provided reimbursement for some or all of the purchase price for Defendants' generic fluocinonide from August 1, 2014 through the present. This class excludes: (a)

---

[36] The "Indirect Purchaser States" consist of Alabama, Arkansas, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic fluocinonide for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic fluocinonide were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

121. The Nationwide Class and the Damages Class are referred to herein as the "Classes."

122. While Plaintiff does not know the exact number of the members of the Classes, Plaintiff believes there are millions of members in each Class.

123. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a.     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize prices of generic fluocinonide;

b.     The identity of the participants of the alleged conspiracy;

c.     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

e.     Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

f.     Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

g.     Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

h.     The effect of the alleged conspiracy on the prices of generic fluocinonide sold in the United States during the Class Period;

i.     The appropriate injunctive and related equitable relief for the Nationwide Class; and

j.     The appropriate class-wide measure of damages for the Damages Class.

124.  Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic fluocinonide purchased indirectly from the Defendants and/or their co-conspirators.

125.  Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

126.  The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

127.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously,

efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

128.  The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## FIRST COUNT
### Violation of Section 1 and 3 of the Sherman Act
### (on behalf of Plaintiff and the Nationwide Class)

129.  Plaintiff repeats the allegations set forth above as if fully set forth herein.

130.  Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

131.  The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

132.  During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to establish a price floor and artificially fix, raise, stabilize, and control prices for generic fluocinonide, thereby creating anticompetitive effects.

133.  The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic fluocinonide.

134.  As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated indirect purchasers in the Nationwide Class who purchased generic fluocinonide have been harmed by paying inflated, supracompetitive prices for generic fluocinonide.

135.  In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

136.  Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for generic fluocinonide has been restrained, suppressed, and/or eliminated in the United States;

(b) Prices for generic fluocinonide provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c) Plaintiff and members of the Nationwide Class who purchased generic fluocinonide indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

137.  Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic fluocinonide purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

138.  The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

139. Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND COUNT**
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiff and the Damages Class)**

140. Plaintiff repeats the allegations set forth above as if fully set forth herein.

141. During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of generic fluocinonide in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

142. The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain artificially supracompetitive prices for generic fluocinonide.

143. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price generic fluocinonide at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to generic fluocinonide provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

144. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of generic fluocinonide.

42

145. Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

146. Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-6-60, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for generic fluocinonide was restrained, suppressed, and eliminated throughout Alabama; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alabama; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Alabama Code § 6-6-60, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Alabama Code § 6-6-60, *et seq*.

147. Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, §§ 44-1401, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for generic fluocinonide was restrained, suppressed, and eliminated throughout Arizona; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated

prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

148. Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code §§ 16700 *et seq.* During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code Section §16720. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of generic fluocinonide at supracompetitive levels. The aforesaid violations of Section 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic fluocinonide. For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic fluocinonide. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic fluocinonide has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic fluocinonide provided by

44

Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased generic fluocinonide directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property in that they paid more for generic fluocinonide than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

149.    Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated §§ 28-4501, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic fluocinonide that were shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic fluocinonide in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic fluocinonide, including in the District of Columbia. During the Class Period, Defendants' illegal conduct

substantially affected District of Columbia commerce. As a direct and proximate result of defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

150. Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

151. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*).

46

Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

152. Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553, *et seq.*

153. Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, §§ 50-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

154. Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.). Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of

48

Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

155. Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

156. Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes §§ 325D.49, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was

restrained, suppressed, and eliminated throughout Minnesota; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

157. Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code

Ann. § 75-21-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

158. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

159. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive,

51

artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

160. Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

161. Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

162. Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws §§ 340, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout New York; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide that were higher than they would have been absent the Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially

affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

163. Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq*.

164. Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*. Defendants' combinations or

conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

165. Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing,

Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

166. Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

167. Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee;

(3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

168. Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

169. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

170. Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants'

unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

171.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

172.   Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiff and members of the Damages Class have paid more for generic fluocinonide than they otherwise would have paid in the absence of

Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

173. In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiff and members of the Damages Class.

174. Accordingly, Plaintiff and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT
### Violation of State Consumer Protection Statutes
### (on behalf of Plaintiff and the Damages Class)

175. Plaintiff repeats the allegations set forth above as if fully set forth herein.

176. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

177. Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic fluocinonide was sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the

following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

178.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic fluocinonide in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a

common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.* of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic fluocinonide in the State of California within the meaning of Section 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic fluocinonide. Plaintiff and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by

Defendants' unfair competition. Plaintiff and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

179.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic fluocinonide was sold, distributed, or obtained in the District of Columbia. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiff and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for generic fluocinonide. Defendants had the sole power to set that price and Plaintiff and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing generic fluocinonide because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic fluocinonide, including their illegal conspiracy to secretly fix the price of generic fluocinonide at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public.

Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic fluocinonide. Defendants' unlawful conduct had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. As a direct and proximate result of the Defendants' conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

180.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct

and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

181.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

182.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq.* Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of

trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic fluocinonide was sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11. Defendants' unlawful conduct had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11, that were knowing or willful, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute, including multiple damages.

183.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.* Plaintiff and members of the Damages Class purchased generic fluocinonide for personal or family purposes. Defendants engaged in the conduct described

herein in connection with the sale of generic fluocinonide in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic fluocinonide was sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic fluocinonide. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of generic fluocinonide they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic fluocinonide by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of generic fluocinonide were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing generic fluocinonide at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful

practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

184.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.* Defendants' unlawful conduct had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Montana; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants marketed, sold, or distributed generic fluocinonide in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-

201, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

185.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic fluocinonide was sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiff and members of the Damages Class and the prices paid by them for generic fluocinonide as set forth in N.M.S.A., § 57-12-2E. Plaintiff and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for generic fluocinonide. Defendants had the sole power to set that price and Plaintiff and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing generic fluocinonide because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic fluocinonide, including their illegal conspiracy to secretly fix the price of generic fluocinonide at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of

Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic fluocinonide. Defendants' unlawful conduct had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

186.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic fluocinonide was sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic fluocinonide that either omitted material information that

rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic fluocinonide; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic fluocinonide were misled to believe that they were paying a fair price for generic fluocinonide or the price increases for generic fluocinonide were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic fluocinonide would have an impact on New York consumers and not just the Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic fluocinonide would have a broad impact, causing consumer class members who indirectly purchased generic fluocinonide to be injured by paying more for generic fluocinonide than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout New York; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants marketed, sold, or distributed generic

fluocinonide in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold, and/or distributed generic fluocinonide in New York. Plaintiff and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

187.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic fluocinonide was sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic fluocinonide created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and

harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants marketed, sold, or distributed generic fluocinonide in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold, and/or distributed generic fluocinonide in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

188.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1, *et seq.*) Members of this Damages Class purchased generic fluocinonide for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at

which generic fluocinonide was sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic fluocinonide. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic fluocinonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic fluocinonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic fluocinonide at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of generic fluocinonide they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and,

accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

189.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, *et seq*.). Defendants' combinations or conspiracies had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq*., and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

190.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic fluocinonide was sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic

fluocinonide. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic fluocinonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic fluocinonide price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic fluocinonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic fluocinonide. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic fluocinonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic fluocinonide at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

**FOURTH COUNT**
**Unjust Enrichment**
**(on behalf of Plaintiff and the Damages Class)**

191.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

192.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on generic fluocinonide.

193.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and members of the Damages Class for generic fluocinonide manufactured by Defendants during the Class Period.

194.    Plaintiff and members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a *pro rata* basis.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment that:

1.    The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state

antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

3.      Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

4.      Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5.      Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.      Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

7.      Plaintiff and members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8.     Plaintiff and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.     Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: December 14, 2016                    Respectfully submitted,


                                            By:  */s/ Scott A. Martin*
                                            Scott A. Martin
                                            HAUSFELD LLP
                                            33 Whitehall Street, 14th Floor
                                            New York, NY 10004
                                            Tel: (646) 357-1100
                                            Fax: (212) 202-4322
                                            Email: smartin@hausfeld.com

                                            Michael P. Lehmann
                                            Bonny E. Sweeney
                                            Christopher L. Lebsock
                                            Stephanie Y. Cho
                                            HAUSFELD LLP
                                            600 Montgomery Street, Suite 3200
                                            San Francisco, CA 94111
                                            Tel:  (415) 633-1908
                                            Fax: (415) 358-4980
                                            Email: mlehmann@hausfeld.com
                                            Email: bsweeney@hausfeld.com
                                            Email: clebsock@hausfeld.com

                                            Michael D. Hausfeld
                                            Sathya S. Gosselin
                                            Jeannine M. Kenney
                                            HAUSFELD LLP
                                            1700 K Street NW, Suite 650
                                            Washington, DC 20006
                                            Tel: (202) 540-7200
                                            Fax: (202) 540-7201
                                            Email: mhausfeld@hausfeld.com
                                            Email: sgosselin@hausfeld.com
                                            Email: jkenney@hausfeld.com

                                            Lee Albert (Pro Hac Vice to be Filed)
                                            Gregory B. Linkh  (GL0477)
                                            GLANCY PRONGAY & MURRAY LLP
                                            122 E. 42nd Street
                                            Suite 2920
                                            New York, NY 10168
                                            Telephone: (212) 682-5340
                                            Fax: (212) 884-0988
                                            Email: lalbert@glancylaw.com
                                            Email: glinkh@glancylaw.com

                                            *Counsel for Plaintiff*

80